HUYLER'S, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GRAMERCY INVESTING CO. OF NEW YORK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GRAMERCY INVESTING CO. OF PENNSYLVANIA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1357, 1445, 1356, 2374, 2373. Promulgated September 10, 1927.

1. In the circumstances, *held* that Huyler's, the Gramercy Investing Co. of New York, and the Gramercy Investing Co. of Pennsylvania were affiliated corporations, within the purview of section

240(b) of the Revenue Act of 1918, during the calendar year 1918 and the nine-month period January 1 to September 30, 1919.

2. Adjustments of invested capital of Huyler's by respondent, on account of capital expenditures erroneously charged to expense in prior years, approved for lack of evidence to show that such adjustments are in error.

3. Evidence insufficient to show that depreciation deductions allowed by respondent, in computing the net income of Huyler's, for the fiscal year 1917, the seven-month period June 1 to December 31, 1918, and the calendar year 1919, are not reasonable or are inadequate to cover wear, tear, and exhaustion actually sustained.

4. March 1, 1913, value of a leasehold owned by Huyler's and annual deduction to be allowed for exhaustion of such value, determined.

5. Values of certain real properties determined, as at date paid in to the Gramercy Investing Co. of New York, for invested capital purposes.

6. March 1, 1913, value of certain real property determined for the purpose of computing the gain realized by the Gramercy Investing Co. of New York from the sale thereof in 1919.

*Lawrence P. Mattingly, Esq., and Rolland L. Nutt, Esq.*, for the petitioners.

*J. Harry Byrne, Esq.*, for the respondent.

The petitioners seek redetermination of deficiencies asserted by respondent for years and in amounts as follows:

| Petitioner | Docket No. | Year | Amount |
|---|---|---|---|
| Huyler's | 1445 | Fiscal 1917 | $3,068.79 |
|  |  | June 1 to December 31, 1918. | 92,474.13 |
| Huyler's | 1357 | Calendar 1919 | 67,664.30 |
| Gramercy Investing Co. of New York | 2374 | 1918 | 1,561.55 |
| Gramercy Investing Co. of New York | 1356 | 1919 | 6,226.60 |
| Gramercy Investing Co. of Pennsylvania | 2373 | 1918 | 241.67 |

In the appeals of Huyler's, Docket Nos. 1357 and 1445, the issues are: (1) Whether petitioner was affiliated with Gramercy Investing Co. of New York and the Gramercy Investing Co. of Pennsylvania during the period June 1 to December 31, 1918, and the period January 1 to September 30, 1919, within the purview of section 240(b) of the Revenue Act of 1918; (2) reduction of invested capital for the fiscal year 1917, the period June 1 to December 31, 1918, and the calendar year 1919, by the amounts of $468,038.69, $427,871.66, and $384,007.05, respectively; (3) disallowance of depreciation deductions in the amounts of $7,654.13, $5,950.86, and $13,875.64, for the fiscal year 1917, the period June 1 to December 31, 1918, and the calendar year 1919, respectively; and (4) the March 1, 1913, value of a certain leasehold, and the annual deduction for exhaus-

tion of such value. In the appeals of the Gramercy Investing Co. of New York, Docket Nos. 1356 and 2374, the issues are: (1) Affiliation with Huyler's during the calendar year 1918 and the period January 1 to September 30, 1919; (2) refusal of respondent to accept, and allow for invested capital purposes, for the years 1918 and 1919, the book values of certain real properties; and (3) refusal of respondent to accept the book value of certain real property alleged to have been sold in 1919, for the purpose of computing the gain derived from the sale thereof. In the appeal of the Gramercy Investing Co. of Pennsylvania, Docket No. 2373, the issues are: (1) Affiliation with Huyler's for the year 1918; and (2) the value of certain real property, acquired from an affiliated company, for invested capital purposes. On motion of the petitioners, the Board, on August 27, 1926, ordered that the appeals be consolidated for hearing.

### FINDINGS OF FACT.

Huyler's, a New York corporation, with its principal office in New York City, was organized in 1881, by the late John S. Huyler, with an authorized paid-in capital of $15,000, consisting of 150 shares of common capital stock of the par value of $100 per share. It is, and was during the years and periods under review, engaged in the manufacture and sale, at wholesale and retail, of candies, confections, soft drinks, and foods. All of the products sold at its stores are manufactured by the petitioner at its own factories, the main factory being situated at 58–64 Irving Place and 128–136 East 18th Street, New York City, with eight or nine branch factories at other points. Its products are disposed of through a chain of approximately 60 retail stores in 28 cities, and, by wholesale, to dealers.

Early in the history of the business, Huyler associated with him in the enterprise two of his friends, Charles J. Coulter and Benjamin F. DeKlyn.

John S. Huyler died in 1910, leaving a will which was duly admitted to probate on October 19th of that year. Said will, so far as is material here, provides as follows:

FIFTH: I GIVE and BEQUEATH to my Executors and Trustees hereinafter named or to such of them as shall qualify, the survivors or survivor of them and their and his successors, all of the Capital Stock of "HUYLERS" a corporation organized and existing under the laws of the State of New York which I may own at the time of my decease, to have and to hold the same, IN TRUST NEVERTHELESS during the natural life of the survivor of the youngest two of such of my sons, FRANK DEK. HUYLER, DAVID HUYLER, COULTER D. HUYLER and JOHN S. HUYLER Junior, as shall be living at the time of my decease, to and for the uses following:

1st. To divide said Capital Stock into as many equal portions as will make one portion for each of my four sons, FRANK DEK. HUYLER, DAVID HUYLER, COULTER D. HUYLER and JOHN S. HUYLER Junior who shall be living at the

time of my death and one portion for the lawful issue of each of my said sons who shall then be deceased leaving lawful issue him then surviving.

2nd. To set apart one of such portion of said Capital Stock as a distinct and separate trust for each of my said sons who shall be living at the time of my death and one of such portions for the lawful issue of each of my said sons who shall then be deceased leaving lawful issue him then surviving.

3rd. To collect and receive the dividends and all other income from each of such portions, and to pay over and apply the same to the beneficiary or beneficiaries for whom said portion is so set apart during the lives of the youngest two of my said sons who shall be living at the time of my death and during the life of the survivor of them; and in the event of the death of any of them before the termination of these trusts hereby created, the share of income theretofore payable to him or her, shall thereafter be paid to his or her issue or descendants, if any, living when such income is payable, in the proportions in which they would respectively inherit real estate from him; and in the event of the death of any of my sons and all of his issue and descendants before the termination of these trusts, the income of such portion as may have been set apart for such son or his issue or descendants, shall be paid to the lawful heirs of such son, living when such income is payable, excluding all of his heirs not of my blood, in the proportions that they would respectively be entitled to inherit real estate from such son.

4th. And upon the death of the survivor of the youngest two of such of my said four sons as shall be living at the time of my decease, as aforesaid, to transfer and set over to each of my said four sons who may then be surviving, the portion set apart for him as hereinbefore directed; and to transfer and set over to the issue or descendants of each of my said four sons who may then be deceased leaving lawful issue him surviving, the portion set apart for such son or for his issue or descendants as aforesaid, in the proportions that they would respectively be entitled to inherit real estate from such son; and to transfer and set over to the lawful heirs of each of my said four sons who may then be deceased without leaving any lawful issue or descendants him then surviving, excluding all of his heirs not of my blood, the portion set apart for him or for his issue or descendants as aforesaid, in the proportions that they would respectively be entitled to inherit real estate from such son.

TENTH: I HEREBY AUTHORIZE and EMPOWER my said Executors and Trustees of the several trusts created or existing by or under any of the provisions of this my will, the survivors and survivor of them and their and his successors, * * * from time to time, in their discretion, to call for the payment of, and to sell and transfer all and any of the property or securities in or upon which any of said trusts, or any part thereof, may be invested, and the proceeds thereof, and the proceeds of any of such real estate sold by them, or any cash of which said trust estates may be made up, to invest and re-invest in other securities and property, not only of the kind as are or may be permissible for trust investments by law existing at the time being, but likewise in the purchase of or loans upon real estate or in the purchase of or loans upon the security of bonds, stocks or any other securities or items of personal property whatsoever and wheresoever located as such Trustees may deem best, though not of the character permissible for trust investments by law * * *.

I also AUTHORIZE and EMPOWER my said Executors and Trustees in their discretion to continue any investment made by me in my lifetime in the stock or bonds of any corporation, domestic or foreign, and to consent to the increase of the capital stock of any such corporation, and to subscribe for, take and pay for the whole or any part of the proportionate share of such increased capital

stock to which they may be entitled; also to subscribe for, take and pay for any portion of the bonds of such corporation hereafter issued, also to consent to a merger or consolidation of such corporation with any other corporation, or to the sale of the whole or any part of the property of such corporation, and in case of such merger, consolidation or sale, to accept in exchange or in lieu of the stock or bonds, held by them, cash, or the stock, bonds or other obligations of the corporation or corporations with which such merger, consolidation or sale is effected, and they are also AUTHORIZED and EMPOWERED in their discretion to continue, during the term of the trusts herein created, any other investment made by me in my lifetime.

I also AUTHORIZE and EMPOWER either or any of my Executors and Trustees to purchase for himself or themselves, any portion of my estate whether real or personal notwithstanding the fact of his or their Executorship or Trusteeship and for the purpose of such purchase, I AUTHORIZE, EMPOWER AND DIRECT my other Executors and Trustees to fix the price in their absolute discretion, and the sale so made shall be binding and conclusive for all purposes whatsoever.

The powers herein conferred upon my said Executors and Trustees, shall apply to each and every trust created or provided for by this my Will, expressly including the trust created by Paragraph or Subdivision FIFTH of this my Will.

TWELFTH : I direct and provide that the shares of stock in any corporation at any time held by my Executors and Trustees, shall always be voted by them or by their proxies at all corporate meetings as a unit and in case of any difference of opinion among my Executors and Trustees as to the manner in which said stock shall be voted or as to the holding and retaining of securities or investments or as to the calling in or making investments and re-investments and as to other matters involved in the management of my estate, I direct that the decision of a majority of my said Executors and Trustees then acting shall be conclusive and shall control and that the act or signatures of any such majority shall be valid to the same extent as if all said Executors and Trustees had joined in the same, and the act or signature of such majority of the acting Executors and Trustees shall in all cases be sufficient to carry out any of the powers, duties and functions of Executors or Trustees, under this Will.

FIFTEENTH : I hereby NOMINATE, CONSTITUTE and APPOINT my sons, FRANK DEK. HUYLER, DAVID HUYLER, COULTER D. HUYLER and JOHN S. HUYLER Junior, or such of them as shall be upwards of twenty-one years of age at the time of my decease, to be Executors of this my LAST WILL AND TESTAMENT, and I also appoint them or such of them as shall be upwards of twenty-one years of age at the time of my decease, and such of them as shall qualify, or the survivors and survivor of them, TRUSTEES to carry out the provisions of this my WILL and guardians of the persons and estates of such of my children as shall be minors at the time of my decease; I also appoint such of my sons last above named who shall be minors at the time of my decease, to be additional Executors of, and Trustees under, this my WILL, upon attaining the ages of twenty-one years respectively, and upon duly qualifying as such Executors and Trustees, with the same powers and duties as the Executors and Trustees first above named, provided, however, and the appointment of all my Trustees under this my WILL is subject to this exception; that neither of my said sons shall be Trustee of the share or fund hereinbefore directed to be set apart and held for him or for his benefit; but as to such share or fund in the case of each of my said sons, the trust shall vest in and be executed by the others of the Trustees hereinbefore named, and the survivors and survivor of them.

Four sons survived John S. Huyler, of whom Coulter D. Huyler and John S. Huyler, Jr., were the two youngest. John S. Huyler, Jr., the youngest of the four sons, not having attained, at the date of his father's death and of probate of the will, the age of twenty-one years, did not qualify as executor and trustee; and he died in 1912 from injuries suffered in a railroad accident, while still a minor and without . issue. Frank DeKlyn Huyler, David Huyler, and Coulter D. Huyler were living and performing their duties as trustees of the several trusts created in their father's will during all of the years and periods under review.

At the time of his death, John S. Huyler was the owner of 96 shares of the capital stock of Huyler's, which, under the provisions of the fifth paragraph of his will, were set aside in trust for the benefit of his four sons. At the death of John S. Huyler, Jr., which occurred subsequent to the death of his sister, the portion of the trust set aside for his benefit under the fifth paragraph of his father's will, reverted to his three brothers and to John S. Huyler Held and Abbie Huyler Held, the two minor children of his deceased sister.

In 1896, Huyler gave to his only sister, Mrs. Martha A. Gaines, 6 shares of the capital stock of Huyler's; and in 1902 he sold to her 15 additional shares of that stock for $100,000, the purchase price, by agreement, to be paid out of the dividends declared and paid thereon.

Until two or three years prior to the date she sold her stockholdings to Coulter D. Huyler, Mrs. Gaines was one of the executive officers of Huyler's, serving in the capacity of assistant treasurer. She was succeeded in that office by her son, who, until July, 1917, was also a member of the board of directors of Huyler's. During the time she was a stockholder of Huyler's, Mrs. Gaines participated in the stockholder's meeting at which she voted her stock either in person or by proxy.

In July, 1917, Mrs. Gaines instituted suit against Frank DeKlyn, David, and Coulter D. Huyler as executors of their father's will. The suit was with reference to a collateral matter entirely and was in no way connected with any act of the defendants in their management of Huyler's. The basis for this action arose as follows: At the time of the incorporation of Huyler's in 1881, for reasons which do not appear, John S. Huyler transferred to his father 50 shares of the capital stock of Huyler's. The latter endorsed the certificates of stock in blank and they were retained in the possession of John S. Huyler. The elder Huyler died in 1884 or 1885 and by will made John S. Huyler executor of his estate, and Mrs. Gaines the residuary legatee thereunder. Following the death of the elder Huyler, the stock in question was transferred, on the books of Huy-

ler's, to the name of John S. Huyler. It was the validity of the latter transfer which Mrs. Gaines attacked in the suit. Immediately after the suit was instituted in July, 1917, or shortly thereafter, Mrs. Gaines' son voluntarily resigned from the directorate of Huyler's. Litigation was not completed until some time subsequent to the year 1919; and then it resulted adversely to Mrs. Gaines.

At the stockholders' meeting held in July, 1918, at which the board of directors of Huyler's was elected for the ensuing year, Mrs. Gaines was represented by proxy, in the person of her attorney, who, in the election of the board of directors, voted for a group of individuals who had not been regularly and duly nominated as candidates for election and who were others than those for whom the votes of Frank DeKlyn, David and Coulter D. Huyler, as stockholders and trustees, were cast.

In 1919, Mrs. Gaines sold her stockholdings in Huyler's to her nephew, Coulter D. Huyler, for the sum of $525,000. The negotiations leading to the sale and purchase of this stock took place in the private residential apartment of Mrs. Gaines; and her son and attorney were present throughout the entire negotiations.

For some time prior to 1916, David Huyler was a director and vice president of Huyler's. In 1916 he suffered a nervous breakdown, and at the following meetings of the stockholders and board of directors was not reelected to either office. Late in the same year or in the following year, he brought suit against Frank DeKlyn Huyler and Coulter D. Huyler which resulted in an amicable settlement being had in chambers late in 1918, an agreement being reached to restore him to both offices.

The Gramercy Investing Co. of New York, a New York corporation with its principal office at New York City, was organized in 1910, with an authorized paid-in capital of $30,000, consisting of 300 shares of common capital stock of the par value of $100 per share, all of which was issued in equal portions to Frank DeKlyn, David and Coulter D. Huyler for cash at par. In 1913 these stockholders paid in to the aforementioned company, without any consideration therefor, certain real properties which had come into their possession through inheritance from their father. These properties were entered upon the books of the company at the values fixed and determined upon for the purposes of the surrogate's appraisal, and which amounted in the aggregate to $1,399,560.33. The company assumed, and recorded upon its books, the mortgages upon certain of the properties, said mortgages amounting in the aggregate to $966,750. The excess of the aggregate value at which the properties were taken up on the books of account over the aggregate amount of the mortgages, or $432,810.33, was credited to donated surplus account.

Included among the properties paid in to the Gramercy Investing Co. of New York by its stockholders in 1913, were the premises known as 58–64 Irving Place and 128–136 East 18th Street and 127 East 17th Street, New York City; the premises known as 301 West 72nd Street, and 263 and 265 West End Avenue, New York City; a one-third interest in the premises known as 458 Fulton Street, Brooklyn, New York; a one-third interest in the premises known as 1320 Chestnut Street, Philadelphia, Pa.; and a one-third interest in the premises known as 1117 F Street, Northwest, Washington, District of Columbia. At the time of the conveyance all of these properties, except 301 West 72nd Street and 263 and 265 West End Avenue, New York City, were occupied by Huyler's.

The premises known as 58–64 Irving Place and 128–136 East 18th Street and 127 East 17th Street, New York City, comprised one tract of land which had been acquired by John S. Huyler prior to 1906. In 1906 or 1907 said Huyler constructed, or caused to be constructed, upon these premises a group of six buildings suitable to the manufacturing needs of Huyler's. From 1907 to 1919, inclusive, Huyler's occupied this property under an oral agreement, as a year-to-year tenant, at an annual rental of $94,000. The cost of the land and buildings to John S. Huyler amounted to $897,170.26. The property was entered upon the books of the Gramercy Investing Co. of New York, at the date paid in, at a value of $699,686.94. Subsequently the book value was written up, as of the date the property was paid in, to $865,004.49, and this was the value at which the property was carried on the books at May 31, 1917. The actual cash value of this property, at the date it was paid in to the Gramercy Investing Co. of New York, was $765,000, of which $367,000 represented the value of the land, and $398,000 represented the value of the buildings.

301 West 72nd Street, and 263 and 265 West End Avenue, New York City, are adjoining properties and are situated at the northwest corner of West 72nd Street and West End Avenue. The dimensions of the three lots are as follows: 301 West 72nd Street is 24 feet by 115 feet; 263 West End Avenue is 18 feet by 115 feet; and 265 West End Avenue is 19 feet by 115 feet. The three lots were improved by four-story apartment buildings of brick-and-limestone construction. These properties were entered upon the books of the Gramercy Investing Co. of New York, at the date paid in, at a value of $225,000. Subsequently the book value was written up, as of the date the property was paid in, to $305,278.80, and this is the value at which the property was carried on the books of account at May 31, 1917. The actual cash value of this property, at the date paid in, was $305,278.80. In December, 1912, the Gramercy Investing Co. of New York purchased the premises known as 267 West End Avenue, New York City, at a cost of $60,000. The latter comprised a

lot 19 feet, 6 inches by 115 feet, adjoining the other properties afore-mentioned, improved by an apartment building of the same general type and character of construction as the buildings on the other properties. The March 1, 1913, value of 301 West 72nd Street, 263, 265, and 267 West End Avenue was $365,278.80, of which $277,950 represented the value of the land and $87,328.80 the value of the buildings.

The premises known as 458 Fulton Street, Brooklyn, 1320 Chestnut Street, Philadelphia, and 1117 F Street, Northwest, Washington, were acquired jointly by John S. Huyler and Benjamin F. DeKlyn and Charles J. Coulter, in the early nineties. The cost to John S. Huyler of his interest in these properties was as follows: $15,000 for a one-third interest in 458 Fulton Street, Brooklyn; $41,000 for a one-third interest in 1320 Chestnut Street, Philadelphia; and $16,808.88 for a one-third interest in 1117 F Street, Northwest, Washington. The values at which they were taken up on the books of the Gramercy Investing Co. of New York, at the date paid in, were as follows: 458 Fulton Street, Brooklyn, $37,683; 1320 Chestnut Street, Philadelphia, $80,000; and 1117 F Street, Northwest, Washington, $26,564. Subsequently the book values were written up, as of the date the properties were paid in, so that on May 31, 1917, they were carried on the books of account at values as follows: 458 Fulton Street, Brooklyn, $83,333; 1320 Chestnut Street, Philadelphia, $133,333.33; and 1117 F Street, Northwest, Washington, $50,000.

458 Fulton Street, Brooklyn, comprised a lot with a frontage of 22 feet, 6 inches and a depth of 72 feet, 7 inches, situated 90 feet east of Hoyt Street in the heart of the retail shopping district of Brooklyn and 90 feet from the entrances of the Hoyt Street subway and Duffield Street elevated stations, a district in which the price level for real estate in Brooklyn is at the highest point. The lot was improved by a five-story brick building, which was occupied by Huyler's as a retail store. Under date of March 30, 1917, the Gramercy Investing Co. of New York, Benjamin F. DeKlyn, and Elizabeth A. Coulter executed a lease of this property to Huyler's for a term of five years from June 1, 1917, at an annual rental of $7,500; lessee to pay all taxes, water rentals, and make all repairs at its own expense. The actual cash value of the one-third interest in this property paid in to the Gramercy Investing Co. of New York by its stockholders was, at the date so paid in, $79,000, of which $75,000 represented the value of the land and $4,000 the value of the building, and the fair rental value of the property at June 1, 1917, was not less than $14,000 per annum, net.

1320 Chestnut Street, Philadelphia, is located directly opposite the main entrance to Wanamaker's department store, just below

Broad Street. The lot was improved by a building. In 1913 the property was occupied by Huyler's as a retail store under a lease dated April 9, 1907, for a term of 10 years, at an annual rental of $9,000, lessee to pay all taxes, water rentals, and make all repairs at its own expense. Shortly after its stockholders paid in a one-third interest in this property to the Gramercy Investing Co. of New York, the latter conveyed said interest to the Gramercy Investing Co. of Pennsylvania, receiving in exchange therefor the entire authorized capital stock of the Pennsylvania company, consisting of 30 shares of a par value of $100 each. Under date of May 31, 1917, the Gramercy Investing Co. of Pennnsylvania, Benjamin F. DeKlyn, and the Farmers Loan & Trust Co. as substituted trustee under the last will and testament of Charles J. Coulter, executed a lease of this property to Huyler's for a term of five years from June 1, 1917, at an annual rental of $9,000; lessee to pay all taxes, water rentals, and make all repairs at its own expense.

The actual cash value of the one-third interest in this property paid in to the Gramercy Investing Co. of New York by its stockholders, was, at the date so paid in, not less than $96,666.67; and the fair rental value of the property at June 1, 1917, was not less than $12,000 per annum, net.

The premises known as 1117 F Street, Northwest, Washington, were improved with a building, and are situated in the heart of the retail shopping district of Washington. In 1913 the property was occupied by Huyler's as a retail store under a lease dated April 9, 1907, for a term of 10 years, at an annual rental of $6,000; lessee to pay all taxes, water rentals, and make all repairs at its own expense. Under date of March 30, 1917, the Gramercy Investing Co. of New York, Benjamin F. DeKlyn, and Elizabeth A. Coulter, executed a lease of this property to Huyler's for a term of 5 years from June 1, 1917, at an annual rental of $6,000; lessee to pay all taxes, water rentals, and make all repairs at its own expense. The actual cash value of the one-third interest in this property paid in to the Gramercy Investing Company of New York by its stockholders was, at the date so paid in, $50,000; and the fair rental value of the property at June 1, 1917, was not less than $10,000 per annum.

The Gramercy Investing Co. of Pennsylvania was organized in 1913 for the purpose of taking over from the Gramercy Investing Co. of New York and holding the property located at 1320 Chestnut Street, Philadelphia, Pa. For the said property the Pennsylvania company issued to the New York company its entire authorized capital stock consisting of 30 shares of the par value of $100 per share.

During the year 1918 and the period January 1 to September 30, 1919, the outstanding stock of the petitioners was held as follows:

| | Huyler's | Gramercy Investing Co. of New York | Gramercy Investing Co. of Pennsylvania |
|---|---|---|---|
| | Shares | Shares | Shares |
| Coulter D. Huyler | 11 | 100 | |
| Frank DeK. Huyler | 11 | 100 | |
| Coulter D., Frank DeK., and David Huyler, Trustees | 96 | | |
| David Huyler | 11 | 100 | |
| Martha A. Gaines | 21 | | |
| Gramercy Investing Co. of New York | | | 30 |
| Total number of shares outstanding | 150 | 300 | 30 |

The Gramercy Investing Co. of New York and the Gramercy Investing Co. of Pennsylvania maintained their offices at Huyler's main factory, East 18th Street and Irving Place, New York City; and for the space so occupied for office purposes they paid no rent to Huyler's.

Under date of June 30, 1919, the attorneys for Huyler's addressed a communication to the then Commissioner of Internal Revenue as follows:

Hon. DANIEL C. ROPER,
> Commissioner of Internal Revenue,
> > Washington, D. C.

SIR: Referring to the request of Huylers Incorporated to file a consolidated income and excess profits return for Huylers, the Gramercy Investing Company, New York, and the Gramercy Investing Company of Pennsylvania, we beg to submit the following facts concerning the affiliation and control of the stock of these corporations in support of such request.

The holdings of the three sons of John F. Huyler, the founder of Huylers, are as follows.

| | Shares |
|---|---|
| Coulter D. Huyler | 43 |
| David Huyler | 43 |
| Frank D. Huyler | 42 |
| Mrs. M. A. Gaines (sister of John F. Huyler) | 20 |

Mrs. Gaines acquired her shares of stock in Huylers as follows: In 1896, John F. Huyler, father of the three above mentioned Huylers and Brothers of Mrs. Gaines, gave to her six shares. In 1902 John F. Huyler purchased fifteen shares from Charles J. Coulter for $200,000, which he sold to Mrs. Gaines for $100,000; in other words, he sold 7½ shares to her for the price he paid and made her a gift of the other 7½ shares.

The three Huyler brothers, Coulter D., David, and Frank D. own all of the stock of the Gramercy Investing Company, New York, and the Gramercy Investing Company of Pennsylvania in equal shares, each having 33⅓ per cent of the stock in these two companies.

The holdings of stock in Huylers Incorporated are as follows:

|  | Shares |
|---|---|
| Coulter D. Huyler | 43 |
| David Huyler | 43 |
| Frank D. Huyler | 42 |
| Mrs. M. A. Gaines | 20 |
| David H. Gaines | 1 |
| N. C. Thrall | 1 |
| Total | 150 |

From these facts it will be seen that these three corporations are affiliated corporations within the terms of the law as all of the stock is owned and controlled by the Huyler family. Therefore, it is requested that written authority be given to file consolidated return as tentative returns have been filed on this basis.

Under date of July 11, 1919, the Bureau of Internal Revenue replied to the foregoing communication as follows:

KEITH, MATTINGLY & NUTT,
    *Southern Building, Washington, D. C.*

SIRS: The Bureau acknowledged your letter of June 30, 1919, regarding the filing of a consolidated income and profits tax return for the taxable year 1918 for the Gramercy Investing Company of Pennsylvania, Gramercy Investing Company of New York, and Huylers, Incorporated.

The data as to stock ownership submitted by you showed that the stock of these three corporations is substantially all owned by Coulter D. Huyler, David Huyler and Frank DeK. Huyler, and that their holdings are in substantially the same proportions. Mrs. M. A. Gaines has a 13% interest in Huyler's, but she acquired only 5% by purchase, the remainder having been given to her by her brother, John F. Huyler, the father of the three majority stockholders.

On the assumption that the stock of these companies is all of one class, and that the holdings as shown existed during the entire taxable year, the Bureau holds that a consolidated return should be filed.

    Respectfully,

                                                    J. A. CALLAN,
                                        *Assistant to the Commissioner.*

Under date of April 29, 1921, the Bureau of Internal Revenue addressed a communication, on the question of affiliation, to Huyler's as follows:

HUYLER'S
    *136 East 18th Street, New York, N. Y.*

SIR: Reference is made to an affidavit dated February 8, 1921, and to an executed Affiliated Corporations Questionnaire for each of the taxable years 1917 and 1918, filed by you.

From the facts presented, you are advised that, during the taxable years 1917, 1918, and 1919, your company was not affiliated with any other company within the purview of Articles 77 and 78 of Regulations 41, Treasury Decision 2662 and Section 240 of the Revenue Act of 1918.

Bureau letter dated July 11, 1919, addressed to Keith, Mattingly & Nutt, should, therefore, be disregarded.

The filing.of a separate excess profits tax return for the taxable year 1917 was the proper procedure. You should file a separate income and profits tax return for each of the taxable years 1918 and 1919, provided that such action has not been taken.

You are further advised that during the taxable years 1917, 1918 and 1919 the Huyler's Bros. Co., Gramercy Investing Co. of N. Y., and Gramercy Investing Co. of Penna. were affiliated within the purview of the authorities cited. A consolidated excess profits tax return for the taxable year 1917 should, therefore, have been filed. In the event that such a return should be needed in auditing the case, you will be notified by this office. A consolidated income and profits tax return for each of the taxable years 1918 and 1919 should be filed, provided that such action has not been taken.

Pursuant to this ruling, a copy of this letter should be attached to each return when filed.

If not in agreement with this ruling, you are requested to submit answer within thirty days from the date of this letter.

In reply, refer to IT: SA: CR: E-MDW.

Respectfully,

E. H. BATSON,
*Acting Deputy Commissioner.*

The names of the persons who served as Commissioner of Internal Revenue during the years and periods under review and their terms of office are as follows:

| Name. | Term of office. |
|---|---|
| Daniel C. Roper | September 26, 1917, to March 31, 1920. |
| Wm. M. Williams | April 1, 1920, to April 11, 1921. |
| Millard F. West (Acting) | April 12, 1921, to May 26, 1921. |
| David H. Blair | May 27, 1921, to present date. |

Prior to 1912, Huyler's pursuant to a policy of conservatism, adopted the accounting practice of carrying its equipment, fixtures, furniture, and machinery in use in its factories and retail stores on its books of account at values considerably less than cost. A considerable quantity of such items were manufactured in Huyler's own shops; the others being purchased from outside sources. In the case of such items as were manufactured by Huyler's only the bare cost of the labor and material used was capitalized on the books of account, nothing being included to cover the overhead burden properly allocable thereto. In the case of such items as were purchased from outside sources, the actual purchase price thereof was capitalized. The cost of installing all such items was consistently charged to expense, nothwithstanding that in a great many instances the installation cost exceeded the actual purchase price or manufacturing cost of the item installed. Replacements and renewals were always charged to expense. The cost of remodeling leased premises, such as plumbing, tiling, and redecorating, was charged to expense in the year in which incurred. At the close of each accounting

period, an inventory was made of additional items of equipment, fixtures, furniture, and machinery acquired during the period, the inventory values being the amounts at which such items were capitalized on the books of account, and 75 per cent of the total inventory value was charged to expense. No depreciation of these assets had been taken into account on the books of the company. Thus the equipment, fixtures, furniture, and machinery were consistently carried on the books of account at a value representing 25 per cent of the amounts originally capitalized.

In April, 1913, the board of directors, desiring that the balance sheets should reflect the company's actual financial conditions, directed a revision of the accounts to properly record the cost of equipment, fixtures, furniture, and machinery. The inventory sheets which had been made at the close of each accounting period, had been preserved and were available to the officers of the company for this purpose. These inventory sheets showed that the aggregate amount at which items of equipment, fixtures, furniture, and machinery were originally capitalized on the books of account exceeded the book value, at May 31, 1912, by the amount of $704,185.80. In other words, the inventories showed that the total amount by which the asset accounts and surplus had been reduced through the annual charges to expense of 75 per cent of the cost of equipment, fixtures, furniture, and machinery originally capitalized was $704,185.80. Acting in accordance with the instructions of the board of directors, said amount of $704,185.80 was restored to the asset accounts and to surplus, as of May 31, 1912, by journal entry dated May 31, 1913. The practice of charging to expense the cost of installing factory machinery and equipment continued after 1912 and has never been changed.

While the returns of Huyler's for the years and periods under review were in process of audit in the Income Tax Unit, the petitioner submitted to the respondent an affidavit executed in its behalf, under date of October 28, 1923, by Coulter D. Huyler, secretary and treasurer, purporting to set forth the facts concerning the cost of purchase of equipment, fixtures, furniture, and machinery, the cost of improvements to and remodeling of leased premises, and the depreciation and exhaustion sustained on the items enumerated. Said affidavit set forth, among other things, the following alleged facts: That the total cost of purchases of equipment, fixtures, furniture, and machinery, to May 31, 1912, amounted to $939,920.86; that the total amount charged to expense, to May 31, 1912, on account of purchases of equipment, fixtures, furniture, and machinery amounted to $709,-248.91; that the total cost of purchases of equipment, fixtures, furniture, and machinery, from June 1, 1912, to May 31, 1916, amounted to $86,085.72; that the total depreciation accrued to May 31, 1916, on

equipment, fixtures, furniture, and machinery, amounted to $778,-079.59; that the cost of additional equipment, fixtures, furniture, and machinery, acquired during the fiscal years ended May 31, 1917 and 1918, the seven-month period ended December 31, 1918, and the year 1919, amounted to $56,471.18, $77,878.57, $20,296.86, and $103,099.16, respectively; and that the depreciation sustained on equipment, fixtures, furniture, and machinery, during the fiscal years ended May 31, 1917 and 1918, the seven-month period ended December 31, 1918, and the year 1919, amounted to $42,315.68, $44,105.09, $28,108.10, and $46,503.76. Said affidavit further set forth that the total cost of remodeling leased premises charged to expense amounted to $136,-346.36; that the total exhaustion of such cost accrued to May 31, 1916, amounted to $85,596.80; and that the exhaustion sustained during the fiscal years ended May 31, 1917 and 1918, the seven-month period ended December 31, 1918, and the year 1919, amounted to $7,705.25, $7,658.92, $4,084.72, and $18,597.42, respectively.

Basing his action upon the facts and figures set out in the affidavit above referred to, the respondent, for invested capital purposes, fixed the values of petitioner's equipment, fixtures, furniture, and machinery, for the fiscal year ended May 31, 1917, the seven-month period ended December 31, 1918, and the year 1919, at $247,926.99, $295,-855.97, and $288,044.73, respectively. The values so fixed and allowed by the respondent for invested capital purposes, were computed as follows:

| | |
|---|---:|
| Cost of purchases to May 31, 1916, as shown by affidavit | $1,026,006.58 |
| Less: Depreciation accrued to May 31, 1916, as shown by affidavit | 778,079.59 |
| Value for invested capital purposes for fiscal year ended May 31, 1917 | 247,926.99 |
| Add: Cost of purchases made during fiscal years 1917 and 1918, as shown by affidavit— | |
| May 31, 1917 _____ $56,471.18 | |
| May 31, 1918 _____ 77,878.57 | 134,349.75 |
| | 382,276.74 |
| Deduct: Depreciation sustained for fiscal years 1917 and 1918, as shown by affidavit— | |
| May 31, 1917 _____ $42,315.68 | |
| May 31, 1918 _____ 44,105.09 | 86,420.77 |
| Value for invested capital purposes for seven-month period ended December 31, 1918 | 295,855.97 |
| Add: Cost of purchases made during period ended December 31, 1918, as shown by affidavit | 20,296.86 |
| | 316,152.83 |

Deduct: Depreciation sustained for period ended December 31,
1918, as shown by affidavit_____ $28, 108. 10

Value for invested capital purposes for year 1919_____ 288, 044. 73

Further, respondent allowed as invested capital, for the fiscal year ended May 31, 1917, the seven-month period ended December 31, 1918, and the year 1919, the sums of $50,749.56, $35,385.39, and $32,134.02, respectively, on account of costs incurred in remodeling leased premises and charged to expense in prior years. The sums so allowed for invested capital purposes, were computed as follows:

Cost of remodeling leased premises to May 31, 1916, as shown by
affidavit_____ $136, 346. 36
Less: Depreciation accrued to May 31, 1916, as shown in affidavit___  85, 596. 80

Amount to be restored to invested capital for fiscal year ended May
31, 1917_____  50, 749. 56
Deduct: Depreciation sustained for fiscal years 1917 and 1918, as
shown by affidavit—
    May 31, 1917_____ $7, 705. 25
    May 31, 1918_____  7, 658. 92
                                      15, 364. 17

Amount to be restored to invested capital for seven-month period
ended December 31, 1918_____  35, 385. 39
Deduct: Depreciation sustained for period ended December 31, 1918, as shown by affidavit_____ $4, 084. 72
    Less: Depreciation disallowed by respondent
        for fiscal year 1918_____ $556. 22
        and period to December 31, 1918_____  277. 13
                                 833. 35
                                         3, 251. 37

Amount to be restored to invested capital for 1919_____  32, 134. 02

The deductions taken by Huyler's in its returns for the years and periods under review, on account of depreciation, the amounts of depreciation stated to have been sustained during such years and periods in the affidavit above referred to, the amounts of the depreciation deductions allowed by respondent, and the amounts of depreciation taken in its returns by the petitioner but disallowed by respondent, are as follows:

|  | Depreciation taken in return | Depreciation as shown in affidavit | Depreciation allowed by respondent | Depreciation disallowed by respondent |
|---|---|---|---|---|
| Fiscal year 1917 | $57, 675. 06 | $50, 020. 93 | $50, 020. 93 | $7, 654. 13 |
| 7 months to December 31, 1918 | 37, 866. 55 | 32, 192. 82 | 31, 915. 69 | 5, 950. 86 |
| Calendar year 1919 | 66, 837. 81 | 52, 962. 17 | 52, 962. 17 | 13, 875. 64 |

On April 30, 1902, Eleanor Louisa Hoffman, Willam M. V. Hoffman, Charles F. Hoffman, Jr., and Laura Isabel Olcott, as surviving executors of the last will and testament of Charles F.

Hoffman, executed a lease to Huyler's, covering the premises known as 508 Fifth Avenue, located between 42nd and 43rd Streets, New York City, for a term of 21 years from May 1, 1902, at an annual rental of $7,000; lessee to pay all duties, taxes, and assessments. The lease contained a provision for the renewal thereof for a further term of 21 years from May 1, 1923, at an annual rental equivalent to 4 per cent of the then agreed upon value of the land. The lot is 25 feet by 102 feet, 2 inches; and at the date of the lease it was improved by a four-story building. This lease was in force and was owned by Huyler's on March 1, 1913; and the entire building was occupied by Huyler's on that date.

The fair market value of the premises known as 508 Fifth Avenue, New York City, at March 1, 1913, was $520,000, of which $500,000 represented the value of the land, the $20,000 the value of the building. The fair rental value of the premises on March 1, 1913, was not less than $26,400, and on May 1, 1923, not less than $26,120. On March 1, 1913, the lease owned by Huyler's had a remaining life, including the renewal period, of 31 years, 2 months. The fair market value of the lease on March 1, 1913, was $160,000.

OPINION.

ARUNDELL: We are called upon to determine whether the proven .facts are such that a logical reasoning must lead to the conclusion that "substantially all the stock" of the two Gramercy companies and of Huyler's was, during the calendar year 1918 and the nine-month period January 1, 1919, to September 30, 1919, "owned or controlled by the same interests," so as to make the determination of their tax liability a single, rather than a multiple, problem. No question arises here as to the affiliation of the Gramercy Investing Co. of New York, and the Gramercy Investing Co. of Pennsylvania; their affiliation with Huyler's is the issue which the parties are contesting.

We have already pointed out the definite test laid down by section 240 of the Revenue Act in determining whether or not two or more corporations are affiliated and that it is only by taking into consideration all of the facts and circumstances that a proper conclusion can be reached. In *Appeal of Rishell Phonograph Co.*, 2 B. T. A. 229, we said:

The statute contains three elements which are not free from doubt. It is impossible to define exactly what is meant by *controls;* no general rule can be made that will fix the percentage necessary to constitute *substantially* all the stock of a corporation; and the word *interests* is a term susceptible of several interpretations.

It would be dangerous to attempt to make a strict definition of any one of these doubtful terms to be applied in every case, for the same. reasons that have caused the courts to avoid attempting to define *due process of law.* If

a strict and generally applicable definition were practicable, it probably would have been furnished by Congress. The very use of elastic terms indicates an intent to have them construed flexibly in the light of the peculiar circumstances of each particular case.

* * * Circumstances which might indicate control in one case would not necessarily constitute it in another where other circumstances, involving other elements, were at variance.

* * * The extent of the stock necessary to constitute substantially all may well vary according to the degree of control exercised.

Our problem then is to weigh all the evidence and come to a conclusion whether, in all the circumstances, the Gramercy Investing Co. of New York, was affiliated with Huyler's; since it must follow that whatever our determination may be in this respect it must be the same in the case of the Gramercy Investing Co. of Pennsylvania, whose entire authorized and outstanding capital stock was owned and controlled by the New York company.

All of the capital stock of the Gramercy Investing Co. of New York was owned outright by the three brothers, Frank DeK., David, and Coulter D. Huyler. These same individuals owned directly 11 shares each, a total of 33 shares, or 22 per cent of the stock of Huyler's, and they held, as trustees under the will of John S. Huyler, an additional 96 shares, or 64 per cent of Huyler's stock, making in all 86 per cent of the stock of Huyler's. Under the will of John S. Huyler, the trustees holding this stock of Huyler's in trust were absolved from every restriction whatsoever with reference to its control, save alone that of dissipating the proceeds from its sale. They were empowered to sell and transfer, in their discretion, all or any part of the securities forming a part of any of the trusts created under the will; to invest and reinvest the proceeds from the sale of such securities; to continue any investment made during the life of the testator; to consent to the increase of the capital stock of any corporation in whose stock the trust funds may be invested; to subscribe for, take, and pay for any portion of the bonds of such corporation; to consent to the merger or consolidation of such corporation with any other corporation, or to the sale of any part of the property of such corporation. These provisions of the will were made to expressly include the trusteed stock of Huyler's. The control of the trustees over this stock was absolute. They could exercise every power vested in direct ownership.

Contention is made by the respondent that the three Huyler brothers, in their individual capacities and in their capacity as trustees, were not the " same interests " within the purview of the statute. This contention is based upon the respondent's assumption that David Huyler and his two brothers were at odds over the business policies and management of Huyler's, as evidenced by David Huyler's

failure of reelection to the directorate of Huyler's, in 1916 or 1917, and the litigation which he instituted against his brothers involving a question as to the interpretation of the will with respect to the voting of the trusteed stock of Huyler's by the three brothers as trustees. But this is not borne out by the facts. The uncontroverted evidence is that David Huyler was not reelected to the directorate of Huyler's because of a physical breakdown which incapacitated him to perform the duties of a director or of an officer of the corporation; and that he, believing that under the provisions of the will the trusteed stock of Huyler's could only be voted by unanimous agreement of the trustees while his two brothers contended that the stock could be voted by a majority of the trustees, instituted litigation for the purpose of securing an interpretation of the provisions of the will relating to the voting of the trusteed stock. The litigation was amicably settled in chambers late in 1918, and an agreement was reached at the same time to restore David Huyler as a director and officer of Huyler's. If there was any connection between David Huyler's failure of reelection as a director of Huyler's and the litigation which he instituted to secure an interpretation of the will, it has not been shown by evidence.

Furthermore, the provisions of the will relating to the voting of shares of stock of any corporation held by the trustees at any time are clear and explicit in providing that such stock " shall always be voted by them or by their proxies at all corporate meetings as a unit and in case of any differences of opinion among my Executors and Trustees as to the manner in which said stock shall be voted   *   *   * I direct that the decision of a majority of my Executors and Trustees then acting shall be conclusive and shall control   *   *   *." All circumstances considered, we must conclude that 86 per cent of the stock of Huyler's was owner or controlled by the same interests who owned and controlled all of the authorized and outstanding stock of the Gramercy Investing Co. of New York.

It appears clear that in Huyler's and the Gramercy Investing Co. of New York, there is a commercial and economic unity. The Gramercy Company was organized by the three Huyler brothers in 1910, and in 1913 they turned over to that company, without any consideration therefor, all of the real properties which had come into their possession through inheritance from their father. At the time these properties were turned over to the Gramercy Company, most of them were occupied, and had been so occupied for several years, by Huyler's. During the years and periods under consideration, three of the properties, 458 Fulton Street, Brooklyn, 1320 Chestnut Street, Philadelphia, and 1117 F Street, Northwest, Washington, D. C., in each of which the Gramercy Company owned a one-third interest,

were occupied by Huyler's under renewal leases dated June 1, 1917. The rentals reserved under these renewal leases were in the same amounts as the rentals reserved under the original leases which had been executed in 1907, and were considerably less than the fair rental value of the properties. Four hundred and fifty-eight Fulton Street, Brooklyn, was leased at an annual rental of $7,500, whereas the fair rental value of that property, at June 1, 1917, was not less than $14,000 per annum; 1320 Chestnut Street, Philadelphia, was leased at an annual rental of $9,000, though the fair rental value of that property, at June 1, 1917, was not less than $12,000 per annum; and 1117 F Street, Northwest, Washington, D. C., was leased at an annual rental of $6,000, while the fair rental value of the property, at June 1, 1917, was not less than $10,000 per annum.

The Gramercy Investing Co. of New York, owned the entire fee in the premises known as East 18th Street and Irving Place, New York City. The land had been acquired by John S. Huyler, the founder of Huyler's, and he had erected thereon a group of six buildings adaptable to the manufacturing needs of Huyler's. From the time of the completion of the buildings in 1907, to and including the year 1919, Huyler's occupied this property, as a year to year tenant, under an oral agreement, at an annual rental of $94,000, although during the years 1918 and 1919 the fair rental value of this property was a considerably higher figure.

It seems clear that in Huyler's and the Gramercy Investing Co. of New York, there is a commercial and economic unity. The Gramercy Company might well be termed the realty-holding company for Huyler's. Save for certain residential properties which it owned, and which constituted but a small portion of the whole, its properties were occupied by Huyler's for less than a fair compensation. It was organized, owned, financed and controlled by the three Huyler brothers, who owned or controlled 86 per cent of the stock of Huyler's. Its corporate duties might have been as well carried on and discharged by Huyler's. Why it was organized as a separate company does not appear, and the reason for it is immaterial here. The officers and directors were the same in both companies. The Gramercy Company maintained its office at Huyler's main factory, East 18th Street and Irving Place, New York City, and paid no rent for the space occupied.

In the ownership by Mrs. Martha A. Gaines of 14 per cent of the stock of Huyler's, the respondent comprehends an active adverse minority sufficient to defeat the claim for affiliation. The litigation instituted in 1917 by Mrs. Gaines against the three Huyler brothers, the resignation of her son from the directorate of Huyler's immediately following the commencement of the litigation, the voting of

Mrs. Gaines' stock, in the stockholder's meeting of July, 1918, for a group of persons who had not been duly nominated as candidates for directors and who were not acceptable to the Huyler brothers, and the presence of Mrs. Gaines' son and attorney during the entire negotiations which led to the sale of her stock to her nephew, Coulter D. Huyler, in 1919, are facts which the respondent links together in a chain of circumstances indicating, he contends, that Mrs. Gaines was an active adverse interest. But the evidence is conclusive that the action which Mrs. Gaines brought in 1917 was against the three Huyler brothers in their capacity as executors of their father's estate on a purely collateral matter in no way connected with any act of the defendants in their management of Huyler's. The resignation of her son from the directorate of Huyler's was his own voluntary act, the reasons for which do not appear. The presence of the son and attorney of Mrs. Gaines, during the negotiations which led to the sale of her stock of Huyler's to her nephew, can hardly be accepted as indicating anything more than a natural desire on the part of Mrs. Gaines and her son to safeguard their own interests. Mrs. Gaines was 65 years of age at the time of the transaction, and the amount involved was in excess of a half million dollars.

It is true that in the election of directors at the stockholders' meeting in July, 1918, Mrs. Gaines' stock was voted for a group of persons who had not been duly nominated for the office of director of Huyler's and who were not acceptable to the three Huyler brothers, and this may indicate that Mrs. Gaines was not in complete harmony with the policies of the Huyler brothers as directors of Huyler's. Perhaps hers was an active adverse interest. But when we examine the problem in its three dimensions, and consider all the facts, we can not help but conclude that Huyler's and the Gramercy Investing Co. of New York, are, in reality, a single commercial and economic unit; that substantially all of the stock of both corporations is owned or controlled by the same interests; and that the situation presented by the relationship of these two companies is precisely that which Congress sought to reach by the provisions of section 240 of the Revenue Act of 1918. Accordingly, we hold that Huyler's, the Gramercy Investing Co. of New York, and the Gramercy Investing Co. of Pennsylvania were affiliated corporations during the year 1918 and the nine-month period January 1 to September 30, 1919, and as such are entitled to have their tax liability, for the year and period stated, determined upon the basis of a consolidated return of net income and invested capital. Since we have decided that the three companies are affiliated corporations, we do not need to pass upon petitioners' contention that Commissioner Blair was without legal authority to overrule the holding of Commissioner Roper that the three companies were affiliated corporations.

The next issue confronting us is respondent's action in reducing the invested capital of Huyler's, for the fiscal year ended May 31, 1917, the seven-month period June 1 to December 31, 1918, and the calendar year 1919, by the amounts of $468,038.69, $427,871.66 and $384,007.05, respectively. The reductions of invested capital alleged to have been made by the respondent are not specifically shown in the deficiency letters, and our examination of the entire record fails to disclose the source or derivation of these figures, or the basis of respondent's alleged action. The facts set forth in the petition upon which the allegation of error is based are, that the petitioner used, as a basis for the computation of invested capital for the years and periods in controversy, the book value of its assets as at the beginning of each year and period, and that the Commissioner reduced the value of said assets by the amounts already stated. It may be that had the petitioner submitted proof of these alleged facts, we would be in a position to extend to it all or a part of the relief for which it prays. But none of these facts were proved. If the respondent has reduced the invested capital for the years and periods in question as alleged, the record does not show it. Nor does it appear that the invested capital allowed by the respondent is less than that shown by the books of account.

The only evidence in the record which appears to have any bearing whatever upon this issue is that relating to the conservative accounting practice of Huyler's prior to 1912, during which period expenditures of a capital nature involving considerable amounts were charged to expense; that equipment, fixtures, furniture and machinery were consistently carried on the books at a value of only 25 per cent of cost; that the cost of remodeling and improvements to leased premises was consistently charged to expense of the year in which made and never capitalized; that at May 31, 1912, the book value of equipment, fixtures, furniture, and machinery was at least $704,185.80 less than actual cost, a situation which had been brought about through arbitrarily writing down the accounts in which such items were carried, at the close of each year, to 25 per cent of cost; and that in May, 1913, said sum of $704,185.80 was restored to asset accounts and to surplus, as of May 31, 1912, in accordance with instructions of the board of directors. Is it the restoration of this amount to the asset accounts and to surplus as of May 31, 1912, which the respondent has questioned, and has only partially permitted for invested capital purposes? The record does not show, and we can not draw inferences.

On the other hand, respondent has placed in the record evidence that in the computation of Huyler's invested capital, for the years and periods in controversy, he has taken into account and permitted

to be restored to asset accounts and to surplus, all capital expenditures which have been identified by the petitioner as having been previously charged to expense less accrued depreciation in amounts computed and determined upon by the petitioner itself. In other words, any adjustment of invested capital which the respondent has made, on account of capital expenditures erroneously charged to expense in prior years, has been made upon the basis of, and in accordance with, facts and figures furnished to him by the petitioner. Not a shred of evidence was submitted to show that the data which the petitioner furnished to respondent and upon which respondent acted in good faith, was not substantially in accord with the actual facts, nor that it showed a situation materially different than that reflected by the books of account. Such being the case we can not disturb the respondent's action complained of in this issue.

The next issue is the action of respondent in disallowing depreciation deductions, for the fiscal year ended May 31, 1917, the seven-month period ended December 31, 1918, and the calendar year 1919 in the amounts of $7,654.13, $5,950.86, and $13,875.64, respectively. The depreciation deductions which respondent has allowed for the years and period in question are less than the deductions claimed by the petitioner in its returns by the amounts above stated. But here again respondent has acted upon the facts and figures submitted to him by the petitioner; and the deductions which he has allowed, except for a difference of $277.13 for the seven-month period ended December 31, 1918, are those which the petitioner itself certified to him in affidavit form as reasonable in amount. If the deductions which respondent has allowed are inadequate to take care of the depreciation actually sustained, it is because petitioner certified to him, in the first instance, amounts inadequate for that purpose. No evidence was submitted by petitioner which might be said to have even a remote bearing upon this issue. The allegation of error stands wholly unproved. We may not, under the circumstances, disturb respondent's action.

The next issue is the March 1, 1913, value of a lease owned by Huyler's on that date covering the premises known as 508 Fifth Avenue, located between 42nd and 43rd Streets, New York City, and the deduction to which petitioner is entitled for each of the years and periods under consideration, on account of the exhaustion of that value. Much expert testimony was introduced, including testimony concerning other rentals in the same neighborhood. The witnesses who gave this testimony were particularly well qualified, through years of experience in dealing in and appraising property in the vicinity of the property concerned, to give opinion evidence

as to real property values. They were in a very favorable position to appraise the value of the property concerned because they had an intimate knowledge of it and its surrounding properties at March 1, 1913. At least two of the witnesses have qualified before other jurisdictions to give opinion evidence as to real property values; one witness having testified as a real property expert in over 400 cases.

The witness, Robert Huntley, has been engaged as a real estate appraiser for the past 26 years, during the last 25 of which he has had charge of the appraisal work of the firm of Joseph P. Day of New York City. Among the important appraisals made by him were the properties of the New York, New Haven & Hartford Railroad Co. in the Boroughs of Manhattan and the Bronx, including the Grand Central Station, which valuation was made for rate-making purposes. He also appraised all of the property on both sides of 42nd Street between Park Avenue and Third Avenue; the properties of the Consolidated Gas Co., the New York Edison Co., the Equitable Building, the New York Stock Exchange Building, a large number of properties in the immediate vicinity of 508 Fifth Avenue, including the properties just across the street, and numerous other properties, some of which were valued for local taxation purposes and others for rate making purposes.

The witness, Watson P. Anderson, has been engaged for the past five years as an appraiser of real estate with an appraisal company. Prior to that time he was a real estate editor of the Record and Guide, a leading real estate publication in New York City, and before entering on his editorial duties had been engaged as an expert appraiser of real estate. He has valued a large number of properties in the immediate vicinity of 508 Fifth Avenue, including all of the property in the block on which this building was located. He has also had wide experience in valuing leaseholds.

The qualifications of these witnesses are such that we are disposed to attach great weight to their testimony. Both witnesses testified that the value of the land at 508 Fifth Avenue at March 1, 1913, was $500,000. Huntley testified that the value of the building at the same date was $20,000, while Anderson placed a value thereon of $26,000. Both testified that a fair rental value for the property at March 1, 1913, and June 1, 1917, was an amount equivalent to 5 per cent of the value of the land, plus 7 per cent of the value of the building. Huntley computed the fair rental of the property at March 1, 1913, to have been $26,400, and at May 1, 1923, $26,120 per annum. At March 1, 1913, the lease had a remaining life, including the renewal period, of 31 years, 2 months. Based upon these factors, the witness Huntley fixed the value of the lease at March 1, 1913, at

$185,237.06, and Anderson placed a value thereon at the same date of $156,969.

We conclude, upon a careful consideration of all of the evidence before us, that the March 1, 1913, value of the lease owned by Huyler's covering the premises known as 508 Fifth Avenue, New York City, was $160,000, and that petitioner is entitled to an annual deduction for exhaustion of the value of the lease of $5,079.37. For the fiscal year ended May 31, 1917, and the calendar year 1919 the petitioner is entitled to deductions for exhaustion in the amount of $5,079.37 each. For the seven-month period ended December 31, 1918, it is entitled to a deduction of seven-twelfths of $5,079.37, or $2,962.96.

In the appeals of the Gramercy Investing Co. of New York, Docket Nos. 1356 and 2374, respondent's action in refusing to accept the book values of certain real properties for invested capital purposes, for the years 1918 and 1919 has been assigned as error. The properties involved are: The premises occupied by Huyler's as a main factory at East 18th Street and Irving Place (58–64 Irving Place and 128–136 East 18th Street and 127 East 17th Street), New York City; a one-third interest in 458 Fulton Street, Brooklyn, New York; a one-third interest in 1320 Chestnut Street, Philadelphia, Pa.; a one-third interest in 1117 F Street, Northwest, Washington, D. C.; and the residential apartment properties at 72nd Street and West End Avenue (301 West 72nd Street and 263 and 265 West End Avenue), New York City; all of which were paid in to the Gramercy Investing Co. of New York in February and April, 1913, by its stockholders without any consideration therefor except that the company assumed whatever mortgages there may have been on the properties at the time.

The above properties were first recorded upon the books of the Gramercy Company at the values fixed and determined upon for the purposes of the surrogate's appraisal in the settlement of the estate of John S. Huyler, which values were subsequently increased in the aggregate amount of $368,015.68 as more particularly appears in the findings of fact.

After carefully considering all of the evidence bearing upon the values of these properties, we have found that in each instance the actual cash value at the date paid in to the Gramercy Investing Co. was greater than the value at which the properties were first recorded upon the company's books, though, in the case of East 18th Street and Irving Place, New York City, 458 Fulton Street, Brooklyn, and 1320 Chestnut Street, Philadelphia, less than, and in the case of 72nd Street and West End Avenue, New York City and 1117 F Street, Northwest, Washington, equal to, the adjusted book

values and the values claimed by the petitioner for invested capital purposes. We have fixed the actual cash value of these properties, at the date paid in to the Gramercy Company, as follows: East 18th Street and Irving Place, New York City, $367,000 for the land and $398,000 for the building, a total of $765,000; one-third interest in 458 Fulton Street, Brooklyn, $75,000 for the land and $4,000 for the building, a total of $79,000; one-third interest in 1320 Chestnut Street, Philadelphia, $96,666.67; one-third interest in 1117 F Street, Northwest, Washington, $50,000; and 72nd Street and West End Avenue, New York City, $305,278.80. In the case of the Philadelphia and Washington properties, we have been unable to determine the value of the land and buildings separately for lack of evidence upon which to base a segregation of those values.

In fixing the values of the above described properties, at the date paid in to the Gramercy Company, except in the case of 1320 Chestnut Street, Philadelphia, we have given great weight to the expert opinion evidence of Huntley and Anderson, whose experience and qualifications we have related in some detail. In giving testimony as to the value of these properties they supported their opinions by evidence of sales of other properties, when it was practicable to do so; and where this was not possible, they explained in detail the manner in which they arrived at their opinions.

The only evidence as to the value of 1320 Chestnut Street, Philadelphia, is the testimony of the witness Lardner Howell, who for the past 11 years has been the real estate officer of the Girard Trust Co., Philadelphia, in which capacity he has had direct charge of all real property of the trust estates agency accounts and of all mortgage loans. He testified that he was familiar with the property in question in 1913, and that, in his opinion, the actual cash value thereof, at the date it was paid in to the Gramercy Company, was $400,000.

1320 Chestnut Street, Philadelphia, is located directly opposite the main entrance to Wanamaker's department store, and close to the intersection of Broad and Chestnut Streets, in the heart of the Philadelphia shopping district. The property was improved by a building, modern in the character of its construction and its conveniences. Some time in 1913 the property at 1312 Chestnut Street, 80 feet distant from 1320 Chestnut Street, was sold for the sum of $290,000. The improvements on 1312 Chestnut Street at the time of the sale consisted of a building not nearly as good or as modern as the one standing at 1320 Chestnut Street.

In arriving at an opinion as to the value of the latter the witness Howell testified that he took into consideration the facts that " Huyler's was well advertised; anybody could find it "; and that the property would have sold for more than 1312 Chestnut Street, " because of the name that was attached to it." To what extent the

witness was influenced by these facts does not appear, but it does appear that the value which he has assigned to the property is somewhat greater than that which would have been the case if the name of another less successful in business than Huyler's had been attached to it. The previous connection of the name of an outstanding successful business enterprise with certain real property appears to us to be an element of doubtful value in the determination of the actual cash value of the property, especially in a case where the purchaser or prospective purchaser would have no right to the use of the name in the conduct of a business carried on in the premises, save, perhaps, merely for the purpose of a more particular identification of the location of his business. We are satisfied from the evidence that the value of 1320 Chestnut Street was at least equal to the value of 1312 Chestnut Street, which was sold for $290,000 in the same year as the first mentioned property was paid in to the Gramercy Investing Co.; but any sum which we might fix in excess of $290,000 would necessarily be a matter of pure guesswork unsupported by any findings of fact. As only the value of a one-third interest in 1320 Chestnut Street, Philadelphia, is at issue here we fix the value thereof at the date paid in to the Gramercy Investing Co. of New York at $96,666.67.

As to the value of 1117 F Street, Northwest, Washington, at the date paid in to the Gramercy Investing Co. of New York, we have the opinion evidence of the witnesses William L. Beale and H. Clifford Bangs. For the past seven years the witness Beale has been real estate officer of the American Security & Trust Co., Washington, and for nearly seven years previous to entering into his present occupation, he was assistant assessor of real property for the District of Columbia. At the present time the witness Beale is also Chairman of the Appraisal Committee of the Washington Real Estate Board. The witness Bangs has been engaged in the real estate business in and around the vicinity of Washington for the past 30 years, during which time he has made and negotiated numerous sales of properties in the down-town business section of Washington. He is at present a member of the Appraisal Committee of the Washington Real Estate Board.

Both of the witnesses, Beale and Bangs, testified that they were familiar with the property at 1117 F Street, Northwest, Washington, in 1913, and both expressed an opinion that its value was $150,000. Late in 1913 or early in 1914, as the result of charges made by an investigating committee that business properties in Washington were underassessed in comparison with the poorer classes of dwellings, for the purposes of local taxation, the Board of Assessors of the District of Columbia undertook a revaluation of the business properties lying between 7th and 15th Streets and Pennsylvania

Avenue and I Street, Northwest. Sales made in 1914 showed that the valuations of the Board of Assessors were within 5 per cent of actual market values. As assistant assessor, the witness Beale was engaged in this work of revaluation. His opinion as to the value of the property under consideration is based upon the knowledge of values which he gained during the investigation and revaluation of business properties by the Board of Assessors, and the sales of other comparable business properties made in and about the year 1913. The witness Bangs, in addition to his knowledge of values of business properties, gained through over 30 years of experience in dealing in real property in and around the vicinity of Washington, 16 years of which were prior to the year 1913, was particularly qualified to pass upon the value of the particular property under consideration because he had negotiated three sales of the property and had twice leased it. The testimony of these two witnesses stands wholly uncontroverted; and in view of all of the foregoing circumstances, we can not help but feel that the value which they have placed upon this property as of 1913 represents the actual cash value thereof at the date paid in to the Gramercy Investing Co. of New York. As only the value of a one-third interest in 1117 F Street, Northwest, Washington, is at issue here, we fix the value thereof at the date paid in to the Gramercy Co. at $50,000.

The next issue is that raised in the appeal of the Gramercy Investing Co. of New York, Docket No. 1356, and involves the determination of the March 1, 1913, value of the property at West 72nd Street and West End Avenue (301 West 72nd Street, 263, 265, and 267 West End Avenue), New York City, for the purpose of computing the gain from the sale thereof in 1919. The selling price of the property is not in dispute. We have already found that the value of 301 West 72nd Street, 263 and 265 West End Avenue, at the date paid in to the Gramercy Company, February, 1913, was $305,278.80, and our reasons therefor have already been stated in this opinion. The property at 267 West End Avenue was purchased in December, 1912, by the Gramercy Investing Co. at a cost of $60,000. We conclude that the March 1, 1913, value of these properties was $365,-278.80 and the gain derived from the sale thereof should be computed upon the basis of such value.

The last issue to be considered is that raised in the appeal of the Gramercy Investing Co. of Pennsylvania, relating to respondent's action in refusing to accept the book value of the property located at 1320 Chestnut Street, Philadelphia, Pa., for invested capital purposes for the year 1918. It will be recalled that the Gramercy Investing Co. of Pennsylvania was organized in 1913 for the purpose of taking over this property from the Gramercy Investing Co. of New York,

and that it paid to the latter in exchange for said property its entire authorized capital stock of $30,000 par value. We have found the value of the property at the date it was paid in to the Gramercy Investing Co. of New York to be $96,666.67. As this transaction occurred a short time before and during the same year we are of the opinion that the property should be included in the invested capital of the Gramercy Investing Co. of Pennsylvania at the same figure.

> *Judgment will be entered on 15 days' notice, in accordance with Rule 50.*

Considered by STERNHAGEN and LANSDON.