PITTSBURGH UNION STOCK YARDS CO. AND PITTSBURGH PROVISION & PACKING CO., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9219, 15813, 32370. Promulgated April 23, 1929.

*Ewing Laporte, Esq.*, for the petitioners.
*Leroy L. Hight, Esq.*, for the respondent.

148

150

152

156

**OPINION.**

MORRIS: These proceedings present for our determination three questions: First, the value of a leasehold acquired in exchange for stock in 1904 for invested capital purposes; second, the value of this leasehold on March 1, 1913, for exhaustion purposes; and, third, whether respondent is barred from assessing and collecting the deficiencies asserted for the fiscal years ended June 30, 1919, 1920, 1921, and 1922, by the statute of limitations.

The statute of limitations question will be considered first. The Revenue Act of 1918, under which the taxes for 1919 and 1920 became due, provides that except in the case of false or fraudulent returns with intent to evade tax, the amount of the tax due should be determined and assessed within five years after the return was due or was made, and no suit or proceeding for the collection of any tax should be begun after the expiration of five years from such dates. The Revenue Act of 1921 contains a similar provision, adding: " unless both the Commissioner and the taxpayer consent in writing to a later determination, assessment, and collection of the tax." The Revenue Act of 1924 provides the same limitation on such taxes and adds the further provision that:

Where both the Commissioner and the taxpayer have consented in writing to the assessment of the tax after the time prescribed in section 277 for its assessment, the tax may be assessed at any time, prior to the expiration of the period agreed upon. (Sec. 278 (c).)

The Pittsburgh Union Stock Yards Co. filed its return for the fiscal year 1919 on September 13, 1919. On October 17, 1924, or more than five years thereafter, a consent was executed extending the period for assessment and collection for one year after the expiration of the statutory period. On August 10, 1925, a second consent in writing was entered into by the parties extending the period for making assessment for the fiscal year 1919 to December 31, 1926. The notice of deficiency was mailed March 16, 1926. In *Joy Floral Co.*, 7 B. T. A. 800, we held on similar facts that the consents were effective to extend the period of limitations, which decision was followed in *Wells Brothers Co.*, 16 B. T. A. 79. We therefore conclude that the assessment and collection of the deficiency for 1919 are not barred.

As to the fiscal year 1920, the petitioners filed separate returns on September 15, 1920. Within the five-year period, namely on June 25, 1925, and June 24, 1925, the petitioners and the respondent consented in writing to extend the period for making assessment of taxes for the fiscal year 1920 to December 31, 1926. The notices of deficiencies were mailed under date of September 23, 1925, or within the statutory period as extended by the consents. It is therefore held that the statute of limitations does not bar the assessment and collection of the deficiencies for that year. *Joy Floral Co., supra.*

A similar situation exists as to the fiscal year 1921, and it is therefore held that as to that year the assessment and collection of the deficiency are not barred by the statute of limitations.

With respect to the fiscal year 1922, the return was filed September 14, 1922, and the four-year period for making assessment under the 1921 Act would therefore expire September 13, 1926. Since the notice of deficiency was mailed April 7, 1926, and a petition was

timely filed, it is evident that the deficiency for that year is not barred.

The petitioner urges that since some of the consents in writing failed to bear the corporate seal, they had no force and effect in extending the period of limitations; that in order to constitute a valid consent the respondent must notify petitioner that he has signed the agreement, and that the execution of the agreement by the corporation and the respondent must be proven. We have considered similar contentions in prior cases and denied them for the reasons therein stated. See *Pictorial Printing Co.*, 12 B. T. A. 1407; *Maple Coal Co.*, 10 B. T. A. 1336, and *Cunningham Sheep & Land Co.*, 7 B. T. A. 652.

The first two questions presented by these proceedings have in effect been disposed of by our findings of fact. We deem.it necessary, however, to point out the principal factors which influenced us in arriving at the values found. We will consider the proof in two large classifications, first the detailed testimony of the two principal witnesses, Anderson and McFadyen, who devoted their time to the stockyard and packing-house business and whose testimony covers the figures on actual earnings, receipts, and dividends; and estimates of prior earnings, receipts, and dividends and their opinions as to the value of the lease at the date of acquisition and on March 1, 1913. In the second group we will consider the leases and sublease with particular reference to the monopolistic character of the covenants contained in the leases between the railroads and the petitioners.

The testimony shows that Anderson had been in the provision and packing business on Herr's Island since 1892 and that McFadyen had been in the stockyard business since 1888 and had been located in Pittsburgh since 1898. In the absence of their books of record, which had been destroyed, these two witnesses testified in detail to actual and estimated earnings, actual and estimated receipts, dividends, and otherwise qualified themselves to express an opinion on the value of the leasehold, and each of them testified to a specific value for the leasehold at December 1, 1904, of $1,200,000, and McFadyen testified that this value was fixed because the incorporators thought the leasehold was worth that amount. Their testimony was not disturbed by respondent's cross-examination, nor were witnesses produced to refute the values which these men had fixed.

The terms of the lease itself indicate that it was very valuable. Articles 15 and 16 therein show that the original lease was in effect a 20-year lease. Another clause in the lease of December 1, 1904, which affects the value of the lease when acquired, is the second clause, wherein the Joint Stock Yards Co., the railroad holding corporation, agreed to arrange with the railroad companies to deliver

# 160

in cars on the leased premises all the livestock which may be transported over said lines of railroad destined to the Pittsburgh market, or any market or station that may be reached therefrom. In addition the petitioners secured by the terms of their lease a large, new, up-to-date stockyard plant which was located on the main lines of two large railroads and their subsidiary companies. These two railroads and their subsidiaries, by their signatures, became parties to the lease and covenanted with the lessee that they would deliver all livestock to the lessee that they lawfully could and that the lessee should have the privilege of furnishing all the necessary feed for local and transit livestock. These covenants, to our mind, almost definitely assured a profitable business to the lessee because there was a fixed differential of profit on all feeds sold, there was a profit on every car of livestock in transit which came within the terms of the Federal 28-hour law, there was a yardage charge of so much per head for every head of livestock placed on the local Pittsburgh market, there was a profit derived from speculative purchases and sales made on the local Pittsburgh market, and there was a profit from the operation of the provision and packing plant.

In capitalizing their company, the sole asset of which was the leasehold, Allerton and his associates had before them all of these factors from which profits would be derived, together with approximately 15 months of actual operation of the premises. With this experience and their intimate knowledge of the volume of receipts and shipments, they were in a good position to determine the value of the leasehold, and subsequent events corroborate the $1,200,000 valuation which they fixed. It is our opinion, therefore, that petitioners have sustained the burden of proof, and we have found as the actual cash value of the lease as at December 1, 1904, the value testified to by the two principal witnesses.

The respondent contends that the stock was issued for services rendered rather than for the leasehold, and that since the evidence fails to show the value of the services rendered, petitioners are not entitled to include any amount in invested capital. We are unable to agree with this reasoning as we are satisfied that the stock was issued in exchange for the lease. The four men interested in the lease dated December 1, 1903, were the same four men who incorporated the business and acquired all the capital stock of the corporation. It is a matter of record, brought out on cross-examination by respondent's counsel, that they had nothing but the leasehold which they had procured for the corporation by the surrender of their own lease, and that the capital stock was issued to them for their consent to the transfer or assignment of their interests to the newly organized company. While the actual mechanics of the transition of this business from a private enterprise to its corporate form were not as

clearly set forth in the record as they might have been, there is no doubt in our minds that the stock was acquired by the individuals in exchange for the lease.

The second question presented was the value of the leasehold at March 1, 1913. We have fixed a value of $800,000 on the leasehold at that date, which value was testified to by Anderson and McFadyen and is supported by the results of the prior nine years of operations at Herr's Island. The respondent contends that the value, if any, which is determined for the leasehold on March 1, 1913, should be exhausted by November 30, 1914, the date of the expiration of the original term. This argument ignores the evident intention of the parties in 1904, the provisions of the renewal clause in the lease, the assurance given the lessee long prior to March 1, 1913, that the lease would be renewed, the mutual advantages which would result to the lessor and lessee from a renewal of the lease, the immense cost to the lessor which would have resulted from taking the "demised premises for other purposes," and, finally, the fact that the lease was renewed less than a year from March 1, 1913. Furthermore, it appears from the fifteenth article of the original lease that, in the event that the parties could not amicably adjust any of their differences, the same should be submitted to a board of arbitration whose decision should be binding and conclusive upon the parties to the lease. In view of all these factors and the unrefuted testimony of Anderson and McFadyen that on March 1, 1913, there was absolutely no doubt about the renewal being granted, we are convinced that the March 1, 1913, value should be exhausted over the remaining life of the original term, plus the renewal period. Cf. *Huyler's et al.*, 8 B. T. A. 13, and *719 Fifth Avenue Co.*, 5 B. T. A. 565.

*Judgment will be entered under Rule 50.*